Estate of Annie T. Stinchfield, Deceased v. Commissioner.
Estate of Annie T. Stinchfield v. Commissioner
Docket No. 2807.
United States Tax Court
1945 Tax Ct. Memo LEXIS 201; 4 T.C.M. (CCH) 511; T.C.M. (RIA) 45168; May 10, 1945
*201 Hal. H. Smith, Esq., Ford Bldg., Detroit 26, Mich., and Alfred E. Lindbloom, Esq., for the petitioner. Philip M. Clark, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves a deficiency of $215,784.82 in estate tax. The issues are whether the value of certain property and the cost of an annuity should be included in the gross estate as transfers in contemplation of death; whether certain installment payments aggregating $16,500 payable to the decedent on the day of her death constitute part of the gross estate, and whether respondent erred in disallowing as deductions from gross estate certain amounts for executor's commissions and attorney's fees. Other issues raised by the petitioner were abandoned. The estate tax return for the decedent was filed with the collector for the sixth district of California. Findings of Fact The decedent, born June 21, 1859, was the widow of Charles Stinchfield, to whom she was married in 1896. They had no children but the decedent reared three children of her husband by another marriage and two of his nephews, Willis V. Cole and Charles Cole. Her husband's children, Charles *202 Stinchfield, Jr., Louise (now Mrs. William Van Dyke) and Marian (now Mrs. L. A. Hopkins) were aged 13, 15 and 10 respectively in 1896. Charles Stinchfield died in September 1918, leaving one-fourth of his residuary estate to trustees, in trust, with directions to pay the net income to the decedent for 10 years from his death, when the trust was to terminate and corpus distributed to the beneficiary, with remainders over to his children in equal shares in the event the decedent died prior to the termination of the trust. Like trusts were created for each of the three children, with remainders over to the beneficiaries' children, if any, in case he or she died within the 10 year period. All of the trusts terminated in 1928. The corpus of the trusts included stock in Parke, Davis & Co. and American Radiator and Standard Sanitary Corporation, hereinafter referred to as American Radiator, corporations of which Stinchfield had been a director. During his lifetime Stinchfield frequently expressed the wish that his holdings of stock of those corporations be retained in the family. The decedent often said that her desire was to carry out such wishes of her deceased husband. She regarded *203 herself as a custodian of the stock to carry out the wish of her husband that the securities remain in the family. The desire of the decedent was to transfer the stock to her stepchildren as soon after the termination of the trust as possible in order to carry out the wish of her husband and to enjoy seeing her stepchildren have the benefit of the stock during her lifetime. In a will executed in January 1928 the decedent stated that she had not otherwise provided for three step-children "although I have them all tenderly in mind, because of the provisions made for them under the will of my husband, Charles Stinchfield." On January 14, 1929, the decedent called at the office of Hal. H. Smith, her attorney, in Detroit, Michigan, and informed him that she desired to make some changes in her will and that she desired to immediately give to her step-children the property she had received as beneficiary of the testamentary trust created by the will of her husband, including stock of Parke, Davis & Co. and American Radiator in order to carry out the wishes of her deceased husband and by doing so help her stop demands being made by Willis V. Cole, for a share in her husband's estate to *204 the same extent as her stepchildren and be relieved of the burden of managing the property. At that time the decedent had an estate of about $500,000, exclusive of assets received from the trust. Counsel prepared a new will for her. In the new will, executed on January 26, 1929, the decedent left her residuary estate to her step-children in equal shares, the children of any child deceased at the time of her death to take the share of their mother or father. A provision of the will read as follows: "SEVENTH: I have not provided (except as they receive the residue of my estate) for LOUISE S. VAN DYKE, MARIAN STINCHFIELD HOPKINS, and CHARLES STINCHFIELD, JR., although I have them all tenderly in mind, because I am presently conveying to them the property which came to me through the trust created under the Will of my husband, CHARLES STINCHFIELD." In a will executed on October 18, 1939, which was admitted to probate, the decedent left her residuary estate to her step-children in equal shares with provision for distribution to children of any deceased child the shares their mother or father would have taken, if living. At a second conference with Hal H. Smith on January 19, 1929, at *205 which Charles Stinchfield, Jr., was present the decedent said she did not need the income from the Parke, Davis & Co. and American Radiator stocks even though she was contributing about $20,000 a year to charities. At this conference the decedent repeated statements she made at the previous meeting that she did not think that the stock was "really hers" and that to carry out her husband's wishes, the property should go to his children without delay. There was also considerable discussion about Willis V. Cole, the decedent remarking that he became very violent at times in interviews with her and expressing a belief that he might try to injure her physically. Charles Stinchfield, Jr. stated that he and his sisters had means of their own and did not need the property, and that his stepmother needed the income from the stock. Another conference was held with Hal H. Smith about 10 days later during which the decedent said that her step-son thought she would need the income from the stock and inquired whether the property could be transferred to a trust with provisions for paying the income to her for life and upon her death the distribution of the corpus to her step-children. Counsel *206 advised her that such a trust could be established but that while it would not accomplish her wish to pass the property immediately to her step-children, such an arrangement would give her the income from the property. Counsel also informed her that if such a trust were established, the income therefrom would be taxable to her and that upon her death the corpus might be subject to tax as a part of her gross estate. A fourth conference was held by the parties after counsel had examined the law on the estate tax question. At such conference, counsel again advised the decedent that if a trust, such as she had in mind, were created, the value of the corpus might be includible in her gross estate as a transfer intended to take effect in possession or enjoyment at or after her death. Decedent then requested counsel to suggest another plan. He advised her to sell the stock to her step-children for an agreed annual payment, in view of her desire to give the property at once to her step-children and her deceased husband's wishes in the matter. The plan was acceptable to the decedent but she wanted to give the stock to her step-children immediately. Charles Stinchfield, Jr. insisted that the *207 annual payment to decedent should be about $60,000, an amount equal to her needs and approximating the dividends on the stock. Counsel informed decedent that she would not be required to pay income taxes on the annual payments and advised Charles Stinchfield, Jr. that stock could be deposited as collateral to insure payment of the installments. Charles Stinchfield, Jr. remarked that counsel was representing the decedent and although he and his sisters were financially responsible, that he wanted, and was sure his sisters desired, security for the decedent under any plan adopted. The decedent requested counsel to draft necessary documents to conclude the transaction on that basis. No definite conclusions were reached at the conference other than that Charles Stinchfield, Jr. should communicate with his sisters to ascertain whether the suggested plan was satisfactory to them. Promptly thereafter counsel prepared a preliminary draft of a security agreement with a trust company, to which it was submitted for comment. Within a few days the decedent left Detroit for Pasadena and did not return until December, 1929. The decedent and Charles Stinchfield, Jr. had another conference with Hal *208 H. Smith in December 1929 in regard to the matter, during which the decedent stated that she still desired to complete the transaction but that her stepchildren had not consented to receive the property. The matter of increased income taxes to the step-children under the plan was discussed and the parties again discussed the question in general. The conference was substantially a repetition of the previous one. In conferences with her counsel, the decedent stated that she had not considered the question of taxes in connection with the transfer of the property, but that she wanted to do so. In the spring of 1930 the decedent's counsel was notified that the step-children had agreed to pay the decedent $66,000 a year, an amount approximating the dividends paid on the stock in 1929, but was not requested to draft documents for the transaction until June 1930, when Charles Stinchfield, Jr. received a telegram from the decedent, then in Pasadena, that she wished to make the "distribution as planned" and to have the documents prepared for execution. Marian Hopkins and her husband had been in Europe and were going there again for an indefinite lengtho f time. This was one of the reasons *209 for the desire of decedent to complete the transaction without further delay. The preparation of documents was completed in August 1930, when they were delivered to Charles Stinchfield, Jr. for execution. On September 15, 1930, the decedent entered into separate written agreements with each of her step-children for the transfer to each of 9970 shares of common stock of Parke, Davis & Co. and 6261 shares of common stock of American Radiator. Each agreement recites that the decedent "agrees to sell, transfer, assign and convey and does hereby sell, transfer, assign and convey unto" the respective parties the shares of stock and that "The consideration of such sale, assignment and transfer * * * is agreed to be the payment" by each individual to the decedent of $22,000 per annum, payable in quarterly installments, beginning October 10, 1930, during the remainder of the life of the decedent, and 6 per cent interest on any installment not paid when due. To conclude the transaction the decedent surrendered certificates for 19,000 shares of stock of the American Radiator, out of which certificates for 6261 shares were issued in favor of each step-child, and certificates for 217 in favor *210 of the decedent, and certificates for 29,910 shares of stock of Parke, Davis & Co., out of which 9970 shares were issued to each step-child. On September 15, 1930, the decedent thought that the worth of her other properties was about $500,000. On the same day irrevocable agreements were entered into by the step-children with the Union Guardian Trust Co. of Detroit, Michigan, under the terms of which the reissued stock certificates, or others for the same number of shares, were delivered to the trust company in trust, to secure the payments to the decedent. The agreements were identical, except for the name of the individual and stock certificate numbers. The instruments provided that the trustee should collect the income from the stock and after deducting trustee charges pay to the decedent $5,500 quarterly, commencing October 10, 1930, for her life and any balance to the settlor on March 5 each year. In case of default for 60 days, upon demand of the decedent, the trustee was obligated to sell, after 10 days notice to the settlor sufficient collateral to pay the overdue installment. The settlor could prevent such a sale by paying a sufficient amount to the trustee to cure the default. *211 Upon the death of the decedent the trusts were to terminate and the corpora delivered to the respective settlors. The dividends on the stocks were generally insufficient to meet the quarterly payments under the contracts and as a result the stepchildren made payments in cash to the trustee and directly to the decedent to cover the deficits. The aggregate cash payments so made to the decedent during the life of the contracts was $593,269.18. In addition thereto, each child made cash payments aggregating $8,221.94 for interest on overdue installments and in November 1940 two of them gave the decedent their notes each for $32,943.17 and the other a note for $32,950, each note bearing interest at the rate of 3 per centum per annum, in settlement of deficits at that time. Payments of $2,167.31 were made by the trustee to each child in January 1931 on account of a surplus in the trustee's accounts. The payments, aggregating $16,500, payable April 10, 1941, were paid by the trustee. Subsequently the payments were returned by the petitioner to the trustee. In 1930 the Travelers Insurance Co. would have charged $606,381.60 for an annuity of $66,000 for a woman 70 years of age. Other insurance *212 companies would have charged about the same amount. Dividends paid on the stocks after September 15, 1930, were included in income tax returns filed by Louise Van Dyke and Marian Hopkins. For an undisclosed period of time prior to 1938 the decedent paid $100 a month to Mary Davis, a resident of Bangor, Maine, for her support. During the early part of 1938, decedent's counsel in Pasadena suggested that she purchase an annuity for Mary Davis in view of the fact that such a plan would result in a saving of income taxes for her and insure regular monthly payments to the annuitant in case the decedent became ill or otherwise could not make the monthly payments promptly. The annuitant needed the payments each month for her support. The decedent purchased the annuity in April 1938 at a cost of $10,380.07. The annuity was reported in a gift return filed by the decedent for 1938. The trustees of the estate of Charles Stinchfield organized the Stinchfield Land Co., a corporation to take title to certain lands. Upon the dissolution of the corporation in 1939 its stockholders, consisting of the decedent and her three step-children, received undivided interests in assets of the corporation. *213 During the early part of 1940, when the decedent became irritated over being asked to sign some papers relating to an item of such property, her counsel in Pasadena suggested that she make a gift of the property to her step-children to rid herself of matters incident to ownership of the assets. She informed her counsel that she had no interest in financial returns from the property. Later in 1940 counsel informed Marian Hopkins and her husband that decedent should convey the assets to her step-children. At about the same time counsel communicated with Charles Stinchfield, Jr., in regard to the subject. At about the same time counsel suggested to decedent that in order to relieve herself of the responsibility of managing her securities she cause her holdings of such property to be moved to Pasadena, and place the good ones in the custody of a bank for management and give the remainder to her step-children. The securities were moved, as suggested by counsel. In June, July, and August 1940 the decedent conveyed her interest in five items of property, consisting of certain land contracts, lots and mining properties, to her step-children. In June 1930 the decedent, while visiting her *214 daughter, Marian Hopkins, in Evanston, Illinois, fell and fractured her hip. She remained at her daughter's home to recover from the injury and was up and around about the middle of September. Her general health at that time was very good. Marian Hopkins went to Europe the latter part of September 1930. Later the decedent closed her daughter's house in Evanston and returned to her home in Pasadena. The decedent fully recovered from the accident. During the summer of 1937 the decedent, Marian Hopkins and her husband, took a sightseeing trip to Alaska and returned. While away the decedent took all the usual sightseeing trips and, except for long tramps, engaged in all of the activities of the party. In 1937 and until her final illness, the decedent was unable to see with complete clearness and had to be careful when going down stairs, and elsewhere walked with care. Aside from a cataract in one eye and failing vision, the decedent's health in January 1939 was normal for a woman of her age. She had an operation for the cataract on March 6, 1940, and was in the hospital for about one month. At that time she was very alert and perfectly normal mentally. The decedent led a very active *215 life and until her final sickness never had a serious illness. It was not unusual for her to remark that she felt so well that she expected to live "forever". At times she had attacks of sciatica. She was interested in church affairs and was actively engaged in charitable work. When she was 80 years of age she made a reservation to go to China and return on the first flight of a Clipper airplane. Willis V. Cole made assertions to the decedent at various times that he had some sort of an arrangement with Charles Stinchfield, whereby he and his brother were to share in his estate to the same extent as his children and he frequently made demands upon her for financial assistance. His demands continued after he gave the Stinchfield family a release of his alleged right to a share of the estate. The decedent had a belief that if she gave her property to her step-children that it would help her get rid of Cole's demands for a share of her husband's estate and for financial assistance. She gave him money over a long period of time prior to 1930. Cole resided in New York for some time prior to 1927 and was quite prosperous until he got into financial and domestic difficulties. He then lived *216 at the home of the decedent in Pasadena for about one and one-half years and during his stay there she gave him money to live extravagantly. Cole then went to Europe and never returned. In 1928, or thereabout, she leased a home for him in Sicily to get color for a book he wished to write. In that year and 1929 she gave him $50,000. She endeavored to reduce her allowance to him to $250 a month until about 1935, when she was greatly disturbed over Cole's continual demands for extra money and turned the matter over to her attorney in Pasadena, who handled them thereafter. She had no desire to discontinue the monthly payments of $250. Cole had a violent disposition and was positive in his views. Prior to the time Cole went to Europe, the decedent expressed fear of physical violence from Cole. As late as 1935 she was afraid he might return to this country and do her harm. The claims made by Cole to a part of the estate of decedent's husband was one of the decedent's greatest worries. He died in France in about 1937 after having been mentally deranged for a year or two. There was no significant change in decedent's physical condition until September 1940, when she had a mild cerebral *217 hemorrhage. There was an extension of the hemorrhage, or a new one, in January 1941. The decedent died at 10:25 A.M., April 10, 1941. The certificate of death, signed by the attending physician gives a cerebral accident due to arterlosclerosis as the immediate cause of death and a ruptured appendix of four months duration as another condition. The petitioner returned a gross estate of $340,342.70 and a net estate of $204,126.61, which amounts the respondent increased to $1,085,166 and $968,941.54, respectively, in his determination of the deficiency. Among the adjustments made by the respondent were the inclusion in the gross estate as transfers made in contemplation of death or to take effect in possession or enjoyment at or after death, the following property at the values shown: Transfers to step-children: Parke, Davis & Co. stock, 9-15-1930
$613,155.00
American Radiator stock, 9-15-30
82,175.64
June, July, August, 1940
20,286.51
Annuity for Mary J. Davis
10,380.07 He also included in the gross estate the installment of $16,500 payable April 10, 1941, under the contracts of September 15, 1930, between the decedent and her step-children, and disallowed *218 as deductions upon the ground that they had not been paid, executors' commissions in the amount of $4,334.65 and $15,666.35 of attorneys' fees claimed in the amount of $20,000. Opinion The chief question relates to the transfers of stock in 1930, the annuity purchased in 1937 for Mary Davis and the transfers of five items of property in 1940. The value of the property is not in dispute. Respondent's contention upon brief is only that the transfers were made in contemplation of death. In cases involving transters alleged to have been made in contemplation of death it is necessary to ascertain the dominant motive for the transfers. The impelling reason may be associated with life rather than thoughts of death, and the health of the donor, while a factor to be weighed, is not controlling. The object of the statute is to embrace transfers made in lieu of testamentary dispositions in order to prevent evasion of estate taxes. To be includible in gross estate as a transfer made in contemplation of death, the motive for the transfer must be of the kine which leads to testamentary disposition. . What was the dominant motive or state *219 of mind of the decedent here as to the stock transferred in September 1930? Respondent makes no claim that the health of decedent at that time was such that she feared death from ordinary causes was imminent. He admits that the facts of record show that in January 1929, when she first discussed the stock transfers with her attorney, her health was good for a woman of her age. It continued to be equally as good until after the last transfer in question, except for confinement for a short time as the result of injury to her hip in June 1930 and an operation in March 1940 for a cataract in an eye. During all of that period she carried on her usual activities without any unusual thought of death. We find nothing in the evidence to conclude that decedent's health, within the meaning of the statute, was a decisive factor in making the transfers. Respondent argues at considerable length that decedent feared death at the hands of Cole and, consequently, the transfers were not only made in contemplation but in fear of death by Cole. The proof does not go that far. There is considerable testimony in the record about the character and disposition of Cole, the frequent demands he made upon the *220 decedent for money upon the basis of a right to participate in the estate of Charles Stinchfield equally with decedent's step-children, a claim for which at some undisclosed time he gave the Stinchfield family a release, and of her fear of him. The evidence establishes that for many years, even as late as 1935, when Cole was residing in Europe, the decedent expressed fear that Cole might bodily harm her, but it does not show that he ever threatened to injure or ever physically injured her. Nothing remotely indicates that she ever feared death at his hands. The decedent's husband was greatly interested in the affairs of Parke, Davis & Co. and American Radiator and during his lifetime frequently expressed a wish that his family would retain his holdings of stock of these corporations. The decedent was aware of her husband's desire in that regard and promptly upon the acquisition of large blocks of the stock, by distribution from a trust created by her husband for her benefit, took steps to put his desire into effect. The respondent requests us to find as a fact that decedent's belief in that regard was nothing more than that she would be carrying out her husband's wishes if she transferred *221 the stock "at some time." The evidence does not establish that Charles Stinchfield ever expressed a wish that decedent transfer the stock to his children immediately upon termination of the trust, or at any other specified time. The decedent received the stock in September 1928 without legal restrictions as to its future use or disposition, and having so received it, her ownership of the securities was unencumbered. Under the circumstances, the wish expressed by decedent's husband to members of his family in regard to future ownership of the stock is important only to the extent of its influence on the motives of decedent, which must prevail in the final analysis. She could have ignored his wish and no legal rights of his children would have been violated. In short, upon receiving the stock from the trust, the decedent had absolute ownership of the stock and was in a position to retain ownership or transfer it to her step-children in accordance with the wish of her husband, and if she chose to comply with the latter, to select the means and the time. She thought she would be carrying out his wishes if she transferred the stock to her step-children promptly and there was no delay on *222 her part in making her decision effective. The expression in the will executed by the decedent on January 26, 1929, that she was presently conveying to her step-children property which she had received from the trust created by her husband corroborates testimony of declarations of the decedent prior thereto with respect to her intentions. Her failure to make the intention effective was entirely due to unwillingness of the step-children to receive the stock without an agreement on their part to reimburse her in some way for loss of income from the securities, which income they thought she needed to continue her style of living. The transfers were made as soon as the children agreed upon the amount of the annual payments. The decedent never regarded herself as more than a custodian of the stock for her step-children, and as such felt that she was under a moral obligation to comply with the desire of her husband. To carry out such wishes and by the transfer, influence Cole to discontinue his demands for financial help, were the dominant motives for the transfer of the stock. The motives were associated with life, rather than death. There is nothing of record to suggest that the *223 other transfers in controversy had any relation to death. Both were suggested by decedent's counsel. The annuity was acquired to save income taxes and to prevent delay in the receipt of payments regularly by the annuitant. The motive for the transfers made in 1940 was to get rid of the management of items of property of little value to the decedent for income purposes. We hold that neither transfers nor annuity were transfers made in contemplation of death. No evidence was offered by the petitioner on the issues relating to deductions for attorney's fees and executor's commissions, in view of which we are in no position to say that error was committed by the respondent in respect to the claimed deductions. No explanation was given in the deficiency notice for including in the gross estate the installments in the amount of $16,500 payable under the contracts of September 15, 1930. The payments were made by the trustee and returned to it by the executors of the estate of the decedent. The parties regard the agreements as annuity contracts and differ only on whether, under the circumstances, payments thereunder are apportionable, the annuitant having died on the day a quarterly *224 installment was payable. At common law, subject to certain exceptions noted in § 6a (2), annuities were not apportionable in respect of time, and it resulted from this general rule that if the annuitant died before or even on the date of payment his representatives were not entitled to a proportionate part of the annuity for the current year. It is immaterial, so far as the applicability of this rule is concerned, that the date of payment is not explicitly declared in the instrument creating the annuity. [3 C.J.S. 1383] The exceptions to the general rule are confined to annuities given for the maintenance of a wife living apart from her husband, for the support of minor children, in lieu of dower or from funds the income from which accrues daily. (3 C.J.S. 1383) In ; , the court said * * * It [rule] resulted from the general rule that if the annuitant died before, or even on, the day of payment, his representatives could claim no portion of the annuity for the current year. * * * The rule has been recognized and followed by courts of other states where the common law has not been changed by statute. *225 ; ; ; , and ; . Here, each of the step-children agreed to pay the decedent $22,000 a year in quarterly installments of $5,500. They were unconditionally obligated to make the payments, and the decedent's right was not limited to collection from any fund. There was no express direction in the agreements that the payments were to accrue ratably, or provision from which such an understanding could be inferred. The decedent had no title to any fund, or income therefrom until paid to her in accordance with the terms of the agreements. None of the exceptions to the rule are applicable. On this issue we hold for the petitioner. Decision will be entered under Rule 50.